**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**CAUSE NO. 1:26-cv-3101**

**GENOMICS USA, INC**
**d/b/a GMS BIOTECH,**

**Plaintiff,** **JURY TRIAL DEMANDED**

**v.**

**PURE TRANSPLANT SOLUTIONS, LLC**
**Defendant.**

## PLAINTIFF'S ORIGINAL COMPLAINT

The Plaintiff Genomics USA, Inc., DBA GMS Biotech Inc, ("GMS" or "Plaintiff") files this Original Complaint against Defendant, Pure Transplant Solutions, LLC ("PTS" or "Defendant"), alleging the following:

## NATURE OF THE CASE

1. This action arises from a long-term collaboration between GMS and PTS to develop and commercialize Human Leukocyte Antigen ("HLA") diagnostic products using GMS's microarray technology, intellectual property, grant-development efforts, and funding together with PTS's HLA protein technology. During the parties' collaboration, GMS assigned intellectual property rights to PTS and secured substantial grant funding, providing more than $3 million to PTS for development of the contemplated technology and products.

2. GMS alleges that although substantial funding secured through GMS was used to develop HLA proteins and transfectants that were necessary components of the contemplated Joint Products, PTS failed to use its contractually required best efforts and adequate resources to perform the corresponding development, integration, validation, and commercialization activities necessary to advance the Joint Products, while PTS continued developing and independently commercializing its standalone HLA protein portfolio.

3. The Phase IIB Joint Project established five Specific Aims intended to advance the parties' combined technology through completion of the HLA protein components, manufacturing and software validation, assembly and validation of finished EZScreen diagnostic kits, clinical beta testing, and RUO product launch. PTS completed the Specific Aim that expanded its HLA protein portfolio, ultimately developing approximately 154 Class II proteins, while the remaining Specific Aims directed toward converting those proteins and GMS's technology into completed Joint Products were not completed.

4. In short, GMS alleges that PTS accepted the benefits of GMS's intellectual property, grant-development efforts, and funding; failed to use its contractually required best efforts to complete development and commercialization of the contemplated Joint Products; and thereafter disposed of assets developed through the collaboration without providing GMS the compensation and information required by the parties' agreements.

**THE PARTIES**

5. GMS is a corporation organized under the laws of Delaware with its principal place of business located at 2018 Westvalley Place, Round Rock, Texas 78665.

6. PTS is a limited liability company organized under the laws of Delaware with its principal place of business located at 800 Research Parkway, Suite 340, Oklahoma City, Oklahoma 73104. PTS also maintains an office at 1105 Castle Court, Austin, Texas 78703. PTS can be served with process by serving its registered agent, National Registered Agents, Inc., located at 1209 Orange Street, Wilmington, Delaware 19801.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) because resolution of Plaintiff's claims requires determination of substantial and disputed issues concerning the scope, coverage, and application of United States patent rights expressly incorporated into the parties' agreements.

9. On November 16, 2018, Plaintiff GMS and Defendant PTS entered into an Assignment and Collaboration Agreement (the "2018 Agreement"), pursuant to which GMS assigned certain patent rights to PTS and the parties established their respective rights and obligations concerning Joint Technology and Joint Products.

10. The 2018 Agreement governs the Parties' development and commercialization of Joint Products using Joint Technology, including inventions, intellectual property rights, and patents arising from their collaboration. Under the Agreement, GMS assigned PTS specified patents, patent applications, and related continuation rights for use in the collaboration, namely U.S. Patent

Nos. 9,751,069; 10,105,674; 10,556,218 (which issued from U.S. Application No. 16/154,347), together with associated continuation and foreign/PCT rights (collectively, the "Patents").

11. Section 5.2(a)(v) of the 2018 Agreement provides GMS with a contractual right to receive consideration based upon acquisitions involving technology and patent rights covered by the Agreement. Determining whether and to what extent consideration received by PTS is subject to that provision requires construction of claims of the Patents and comparison of those claims to the technology, materials, methods, and assets transferred, commercialized, or otherwise disposed of by PTS.

12. Determining whether the transferred assets were attributable to the Patents cannot be resolved solely by reference to the contractual language of the 2018 Agreement because the Agreement identifies specific United States patents and patent applications whose scope must be determined and applied to the transferred technology.

13. Those patent issues are actually disputed. PTS maintains that the transferred HLA-protein assets constituted standalone PTS technology outside GMS's contractual rights. GMS contends that portions of the transferred technology constitute, embody, or practice technology falling within the scope of the Patents and/or constitute Joint Technology developed pursuant to the Joint Project.

14. The patent issues are actually disputed and substantial because resolution of GMS's claim under Section 5.2(a)(v) requires determining whether technology transferred by PTS falls within the scope of existing United States patent claims and patent rights expressly incorporated into the Agreement. Patent-scope determinations are necessary predicates to deciding the parties' contractual rights and obligations.

15. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over GMS's remaining state-law claims because those claims are so related to the claim within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Specifically, the federal and state law claims derive from a common nucleus of operative fact, as they arise out of the same breach of contract between GMS and PTS. Trying the claims together in a single judicial proceeding will promote judicial economy, convenience, and fairness to the parties.

16. This Court has personal jurisdiction over PTS. PTS purposefully availed itself of Texas by entering into agreements with GMS, performing contractual obligations in Texas, maintaining and publicly using an Austin, Texas office address, and directing the conduct giving rise to this action toward Texas. Accordingly, PTS is subject to personal jurisdiction in this District.

17. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Austin, Texas, including execution of agreements, PTS's performance of its obligations, communications between the parties, and injury to GMS. Additionally, PTS maintains an office in Austin, Texas.

18. Section 9.4 of the 2018 Agreement further provides that the Agreement shall be interpreted and enforced under Texas law and that suits to enforce the Agreement or any provision thereof shall be brought exclusively in the state or federal courts of Texas.

## ARBITRATION AND RESERVATION OF RIGHTS

19. The 2018 Agreement contains both a Texas judicial-forum provision in Section 9.4 and an arbitration provision in Section 9.5 applicable to controversies, claims, or disputes arising out of

or relating to the Agreement or an alleged breach thereof. GMS files this action without waiving, repudiating, or challenging any right available to it under Section 9.5 or the Federal Arbitration Act.

20. GMS expressly reserves its rights to initiate, demand, consent to, or participate in arbitration of any arbitrable issue and to seek appropriate judicial relief in connection with such arbitration.

21. To the extent this Court determines that any claim or issue asserted herein must initially be submitted to arbitration, GMS requests that the Court stay the affected proceedings pending completion of arbitration rather than dismiss this action.

## FACTUAL ALLEGATIONS

### A. GMS's and PTS's Collaboration

22. GMS and PTS entered into a collaborative relationship in 2013 for the purpose of developing and commercializing HLA diagnostic products utilizing GMS's microarray technology and PTS's HLA proteins. In 2015, GMS and PTS entered into a Joint Venture Agreement to develop jointly contemplated HLA diagnostic products and related Joint Technology, which was later superseded by the Parties' 2018 Assignment and Collaboration Agreement ("2018 Agreement").

23. GMS funded an initial feasibility and validation study to explore and confirm that GMS microarray technology and soluble HLA proteins were compatible for the diagnostic assay. Preliminary results from this initial study formed the basis for all subsequent grant funding.

**B. Grant Development, Funding, and GMS's Contributions**

24. GMS assisted PTS in preparing an Oklahoma funding proposal of approximately $650,000 after PTS's prior efforts had been unsuccessful. GMS identified the issues in PTS's prior proposals and assisted in revising the proposal, using preliminary results from the feasibility and validation study. More than eighty-five percent of that award was allocated to PTS.

25. GMS later initiated and secured a Phase II award from the National Institutes of Health (NIH), with GMS as the primary awardee and PTS as a subcontractor. PTS received approximately $1.2 million over two (2) years under that award.

26. GMS also secured a Phase IIB NIH award in 2018 for a three-year period beginning in 2019. PTS received approximately $1.5 million as GMS's subcontractor under that award. Together with the Oklahoma award that GMS helped secure, GMS's efforts resulted in more than $3.25 million in funding for the Parties' collaborative work, the substantial majority of which was allocated to PTS.

27. Near the end of the Phase IIB grant, after grant funds were depleted, GMS paid PTS an additional $25,000 from GMS's own account for reagents used in protein production. GMS provided that additional funding in furtherance of the parties' objective of developing and commercializing the chip-based diagnostic assay utilizing HLA proteins.

28. GMS was principally responsible for identifying, analyzing, drafting, compiling, and presenting the materials required to secure the NIH grant funding and that the funding materially advanced PTS's sHLA protein-development efforts.

29. PTS did not possess the demonstrated experience and track record that GMS possessed in securing highly competitive federal grants.

30. GMS possessed substantial experience and a demonstrated record in obtaining Phase II and Phase IIB grant funding and provided significant expertise in preparing and pursuing the grant applications supporting the Parties' collaborative work

31. GMS has successfully raised over $15,000,000 through several Phase II and Phase IIB grants.

32. The grant funding secured through GMS's efforts was especially valuable and beneficial to PTS because it provided substantial funding for PTS's development efforts without requiring PTS to obtain comparable outside equity financing.

33. GMS's work and contributions were provided in furtherance of the Parties' shared objective of developing and commercializing a chip-based diagnostic assay utilizing HLA proteins. Consistent with that objective, Section 4.3 of the 2018 Agreement required the Parties to confer and use their best efforts to jointly develop Joint Products, including as outlined under NIH Phase IIB grant. The written subawards and agreements define the parties' precise obligations and control to the extent their terms apply.

**C. The Phase IIB Joint Product Development Plan**

34. The Phase IIB project was expressly directed toward completing development of the combined GMS/PTS diagnostic products and advancing those products through RUO product launch and clinical beta testing.

35. The Phase IIB project contemplated five Specific Aims: (1) completion of cloning, expression, and manufacture of the remaining Class II sHLA proteins; (2) completion of validation of EZScreen manufacture at a third-party OEM supplier; (3) completion of EZScreen analysis-

software validation; (4) manufacture of the EZScreen I and EZScreen II diagnostic kits; and (5) beta testing of the completed products at three ASHI reference laboratories.

36. Thus, development of additional PTS HLA proteins was only one component of the Phase IIB project. The stated commercial objective was to combine PTS's recombinant HLA proteins with GMS's microarray technology into two finished diagnostic products, EZScreen I and EZScreen II, and advance those products through manufacture, RUO launch, clinical beta testing, and preparation for FDA review.

37. The Phase IIB Specific Aims described the project as extending the parties' ongoing partnership into "RUO product launch and clinical beta testing" through manufacturing scale-up, software testing, and clinical performance testing of the microarray-based EZScreen test.

38. The Phase IIB Specific Aims further represented that, before Phase IIB commenced, design and optimization of the two microarray tests were already "nearly complete." The Class I probe set of 120 recombinant HLA proteins was represented as 100% complete, while the Class II probe set was approximately 50% complete and expected to reach approximately 70% completion before commencement of the Phase IIB work.

39. Accordingly, Phase IIB was not proposed merely as a research program to expand PTS's HLA protein inventory. It was proposed as a development and commercialization program intended to convert the parties' substantially developed component technologies into manufactured, validated, beta-tested EZScreen diagnostic kits suitable for RUO product launch and subsequent FDA review.

40. PTS completed Specific Aim 1, which called for completion of the Class II sHLA protein probe set. Although SA1 contemplated development of 117 Class II proteins, PTS ultimately developed approximately 154 Class II proteins. The remaining Joint Product objectives, however,

were not completed. Specifically, the Phase IIB project did not result in completed and validated manufacture of the EZScreen products under SA2, completed and field-validated EZScreen analysis software under SA3, completed and validated EZScreen I and EZScreen II kits under SA4, or completed three-site clinical beta testing under SA5. No EZScreen Joint Product proceeded to the contemplated RUO product launch.

41. Thus, although PTS completed the Phase IIB objective that developed and expanded the HLA protein portfolio owned and independently commercializable by PTS, the remaining Specific Aims directed toward converting the Parties' technologies into manufactured, validated, clinically tested Joint Products were not completed. GMS received no completed Joint Product, and no EZScreen product proceeded to the contemplated RUO product launch.

42. At the commencement of Phase IIB, the Parties did not characterize the Joint Product as speculative early-stage research. The Phase IIB Specific Aims represented that design and optimization of EZScreen I and EZScreen II were already "nearly complete," that the Class I probe set was 100% complete and ready for product launch and beta testing, and that substantial progress had already been made toward completion of the Class II probe set. Phase IIB was therefore proposed as the program that would advance the parties' existing technology through manufacturing scale-up, validation, clinical beta testing, and commercial RUO launch.

**D. The 2018 Assignment and Collaboration Agreement**

43. In 2018, PTS drafted an IP assignment agreement in which GMS was required to assign its intellectual property on protein array patents in exchange for 20% of the proceeds from commercialization. GMS was not initially willing to assign its intellectual property to PTS. PTS insisted that the chances of finding a commercial partner were much higher if PTS had ownership

of all the intellectual property. GMS agreed to the assignment with a clear understanding that PTS would lead the initiatives to commercialize the product.

44. On November 16, 2018, GMS and PTS entered into an Assignment and Collaboration Agreement ("2018 Agreement"). Under the Agreement, GMS assigned to PTS rights in intellectual property identified in Exhibit B to PTS.

45. The 2018 Agreement defined "Joint Products", "Joint Project" and "Joint Technology." Section 1.9 defined Joint Products as diagnostic tools involving HLA proteins attached to solid supports developed under the Agreement. Joint Products did not include HLA Class I or II proteins themselves, diagnostic products with HLA proteins tethered to a substrate not developed under the Agreement, and did not include substrates bound to proteins other than Class I or Class II HLA proteins.

46. Section 1.10 of the 2018 Agreement defines a "Joint Project" as a collaborative effort undertaken by the Parties for the purpose of developing Joint Technology or a Joint Product and expressly identifies the Parties' collaboration under NIH Phase IIB Grant No. 2R44AI122642 as an example of a Joint Project.

47. Section 1.11 of the 2018 Agreement defines "Joint Technology" broadly to include intellectual-property rights jointly developed pursuant to the Parties' agreements, including Collaboration Patents, Joint Products, Materials, Documentation, test results, and evaluations of test results produced pursuant to a Joint Project.

48. Section 4.3 imposes an express development obligation upon both Parties. It provides that the Parties "will confer and use their best efforts during the Term of this Agreement to jointly develop 'Joint Products' as specified in the Project Terms and Conditions Addendum and outlined in NIH Phase IIB Grant No. 2R44AI122642."

49. The Phase IIB project expressly incorporated into Section 4.3 contemplated advancement of the combined technology through RUO product launch and clinical beta testing and identified five Specific Aims directed toward completing the remaining protein development, transferring and validating manufacture, validating software, manufacturing complete kits, and conducting clinical beta testing at three reference laboratories.

50. It was explicitly agreed and understood that both parties would benefit from the partnership. Section 5.2 states that GMS would receive 20% royalty based on the total value received by PTS from third parties for several categories, such as licensing, developing or technology transfer fees, and monetary consideration received by PTS from net sales of Joint Products.

51. GMS and PTS later amended the 2018 Agreement. The Parties executed the First Amendment to the Assignment and Collaboration Agreement ("First Amendment"). The First Amendment replaced Section 2.6 to provide that, if PTS did not close a commercialization deal or initiate commercial sales of Joint Products by January 31, 2023 or the end of the NIH grant period, PTS would assign back to GMS the intellectual property assigned under Article 2 of the Agreement. PTS's royalty obligations remained applicable after the reassignment.

52. Under Section 5.2(a)(v) of the 2018 Agreement, PTS agreed to pay GMS a 20% royalty in the event of an acquisition involving the Joint Products technology or the patents listed in Exhibits A or B.

## E. PTS's Use of the Collaboration's Resources

53. The Parties understood that additional funding beyond the federal award would be required to accomplish all project objectives. In January 2018, during the Parties' Phase IIB budgeting

discussions, GMS expressly reminded PTS personnel that the funding shortfall would have to be obtained through third-party financing. PTS's own personnel contemporaneously recognized the substantial funding requirements associated with completion of PTS's project activities. PTS undertook primary commercialization responsibility knowing that substantial third-party funding would be required to commercialize the Joint Product.

54. GMS continued identifying potential sources of additional grant funding that could have supported continued development of the Joint Products. According to GMS, pursuit of such additional funding required corresponding outside financial commitments that PTS did not secure or provide. When the Phase IIB grant funding ended, development activity directed toward the Joint Products ceased, notwithstanding that SA2-SA5 and the contemplated RUO product launch remained incomplete.

55. PTS subsequently obtained or had access to substantial capital independent of the grant. PTS has represented that millions of dollars were invested in PTS and its affiliates before and beyond the NIH grant and that substantial privately funded resources were devoted to PTS's HLA-protein and transfectant operations. Nevertheless, while material Joint Product development allegedly remained incomplete, PTS continued allocating independent resources to its standalone HLA-protein business.

56. PTS claims that Pure Protein had independently funded its protein-production and supply operations. GMS alleges that PTS's decision to invest independent resources in the HLA-protein business from which PTS retained the independent economic benefit, while declining further investment necessary to advance the Joint Product, is evidence that PTS failed to satisfy its Section 4.3 best-efforts obligation.

57. Upon information and belief, PTS and its affiliates obtained, controlled, or deployed substantial capital and resources during the relevant period. Nevertheless, those resources were not deployed in a manner sufficient to accomplish the remaining objectives of the Phase IIB Joint Project, including SA2 through SA5 and the contemplated RUO commercialization of the Joint Products.

58. PTS contends that it separately funded business-development efforts, including retaining Back Bay Life Science Advisors to seek potential commercialization partners. Those efforts, however, did not substitute for PTS's separate obligation under Section 4.3 to use its best efforts to jointly develop the Joint Products in accordance with the Phase IIB program. GMS alleges that attempting to market or license the technology did not satisfy that development obligation where the underlying Phase IIB Joint Product objectives remained incomplete.

59. During the Phase II project and most of the Phase IIB project, substantial work focused on cloning, expressing, and producing new Class I and Class II HLA proteins and solving technical issues involving DQ and DP proteins. GMS alleges that PTS did not use its best efforts, as required by Section 4.3, to jointly develop Joint Products because the downstream development objectives necessary to create and validate the envisioned EZScreen products, including manufacturing validation, software validation, kit validation, beta testing, and RUO launch, were not completed. Because such minimal work was completed, GMS was unable to showcase its platform for non-HLA proteins and thereby impeded GMS's future business opportunities.

60. Before the grant-funded work, PTS had approximately 37 Class II alleles. Specific Aim 1 of Phase IIB contemplated expanding the Class II protein set to 117 proteins. PTS completed SA1 and ultimately developed approximately 154 Class II proteins, exceeding the stated SA1 objective.

By contrast, SA2-SA5, which were directed toward manufacturing, validating, beta testing, and advancing the combined EZScreen Joint Products toward RUO launch, were not completed.

61. GMS alleges that the funding and work it supplied or secured enabled PTS to complete and materially enhance a commercially marketable HLA-protein portfolio. PTS thereafter marketed HLA proteins through hlaprotein.com without identifying GMS or the GMS platform and without commercializing a corresponding Joint Product. Because the grant funding materially contributed to development and expansion of PTS's HLA protein portfolio, PTS thereafter offered and sold HLA proteins through hlaprotein.com and retained the revenues from those sales without commercializing a corresponding Joint Product.

62. Development activity directed toward completion of the Joint Products ceased when Phase IIB grant funding ended with the completion of 154 Class II alleles, while PTS and its affiliates continued obtaining, deploying, and devoting substantial resources toward PTS's independently owned HLA-protein business while the Joint Product objectives remained incomplete.

63. PTS declined to retain certain assigned GMS patents or continue paying the patent maintenance fees. PTS also declined alternatives proposed by GMS to continue the collaboration or facilitate commercialization.

**F. PTS's Asset Sale**

64. Around February or March of 2020, PTS claimed that a large company showed interest in licensing or acquiring the Joint Products or the technology and was ready to execute a term sheet. That company, however, changed its mind because of Covid as it decided to focus its efforts on Covid diagnostics. Additionally, PTS claimed that finding a partner for commercialization was only a question of when, not if, they would find one.

65. On May 5, 2025, GMS learned from Rico Buchli, Chief Scientist at PTS, that PTS had sold its assets to a third party. GMS did not then know the transaction, date, buyer, complete asset schedule, consideration, or terms.

66. On or about July 22, 2025, PTS stated that no sale of Pure Protein or HLA Protein assets had occurred and that discussions with a prospective management group remained ongoing. The parties scheduled an August 6, 2025, call concerning GMS's concerns and the potential transaction.

67. PTS did not give GMS advance notice of a completed disposition or an opportunity to address GMS's contractual interests before closing, precluding the possibility of a mutually beneficial arrangement. Section 5.2(a)(v) of the 2018 Agreement establishes a 20% royalty and allocation mechanism for qualifying acquisitions attributable to the Joint Products and Joint Technology. GMS alleges that the disposition included the HLA-protein assets that had been developed or materially enhanced through the parties' collaboration and grant-funded work and eliminated essential inputs needed to commercialize the contemplated Joint Products. The nature and allocation of the consideration received in the transaction are material to determining whether any portion was attributable to the commercialization of the Joint Technology, including the manufacture or sale of Joint Products or rights associated with the patents identified in Exhibits A or B, and thus subject to the royalty provisions of Section 5.2.

68. On or about December 16, 2025, PTS or its representatives stated that the Pure Protein/HLA Protein assets had sold for at least $300,000 and that the proceeds had been used to pay outstanding debts and provide limited wind-down runway. They further asserted that no profit or distributable value remained. GMS received no payment from PTS.

69. The identity of the purchaser, precise transaction date, assets transferred, consideration paid, liabilities satisfied, recipients of payments, and relationship between PTS, Pure Protein, and

Emergent Technologies remain within PTS's or affiliated persons' possession and have not been disclosed to GMS.

**G. Failure to Develop Joint Products and to Account**

70. At the end of the collaboration, no Joint Products were commercialized, and GMS received no compensation or other financial return from the collaboration. GMS disputes PTS's contention that the NIH final report established full contractual performance as the report described technical accomplishments but acknowledged that a Joint Product had not been commercialized. The Amended Section 2.6 required PTS to make royalty payments to GMS if any of the events specified in Article 5 of the 2018 Agreement are met, even after January 31, 2023 or the end of the Project Period for the NIH Grant.

71. On September 24, 2025, GMS requested the letter of intent, executed transaction agreements, and closing documents relating to the reported asset disposition. On January 8, 2026, GMS expanded its request to include transaction, valuation, marketing, financial, distribution, compensation, and board records. GMS renewed its requests on February 19 and March 9, 2026.

72. PTS refused to provide the requested records and stated that its internal and external legal review found no contractual basis for GMS's position. PTS also maintained that the 2018 Agreement did not require sharing proceeds from standalone HLA-protein assets and that any 20% acquisition royalty applied only to Joint Products.

## COUNT I

## BREACH OF CONTRACT

## (Texas Common Law)

73. GMS incorporates paragraphs 1-72.

74. The 2018 Agreement and the First Amendment constitute valid contracts.

75. GMS performed its material obligations under the 2018 Agreement, including by assigning the identified intellectual-property rights pursuant to Section 2.2 and contributing its technology, development efforts, and grant-related efforts toward development of the Joint Products as contemplated by the Agreement. GMS also performed its joint-development obligations under Section 4.3 by, among other things, securing and administering substantial grant funding supporting development of the Joint Products.

76. PTS materially breached its obligations under the 2018 Agreement by, among other things: (a) failing to use its best efforts to jointly develop the Joint Products as expressly required by Section 4.3, notwithstanding that Section 4.3 specifically tied that obligation to NIH Phase IIB Grant No. 2R44AI122642 and the Phase IIB project expressly contemplated advancing the combined GMS/PTS technology through completion of five Specific Aims directed toward an RUO product launch and clinical beta testing; (b) notwithstanding PTS's completion of Specific Aim 1 and substantial expansion of its independently owned HLA protein portfolio, failing to use its best efforts to accomplish the remaining stated objectives of the Phase IIB Joint Project, including validated manufacture of the EZScreen products under Specific Aim 2, validation of the EZScreen analysis software under Specific Aim 3, manufacture and validation of completed EZScreen I and EZScreen II kits under Specific Aim 4, and three-site clinical beta testing under

Specific Aim 5, with the result that no completed Joint Product proceeded to the contemplated RUO product launch; (c) while the Phase IIB Joint Product objectives remained incomplete, directing substantial grant-funded and independently funded resources toward the development, production, maintenance, and commercialization of PTS's HLA protein and transfectant portfolio, from which PTS retained an independent commercial benefit, while failing adequately to contribute or deploy the additional resources, personnel, technology, proteins, and collaborative development efforts necessary to advance the Joint Products; (d) after recognizing that the federal grant funding would be insufficient to accomplish all development objectives, failing to use its best efforts to obtain and deploy additional resources necessary to advance the Joint Products, notwithstanding that PTS and its affiliates obtained, controlled, or deployed substantial capital and resources toward PTS's independently owned HLA-protein and transfectant business; and (e) failing to pay amounts due to GMS under Section 5.2, including any acquisition-related royalty due under Section 5.2(a)(v) to the extent consideration received in the asset transaction was attributable to Joint Technology or the patent rights identified in Exhibits A or B.

77. Section 5.2(e) additionally provides GMS a contractual audit mechanism permitting an independent public accounting firm meeting the Agreement's requirements to examine designated PTS books and records, including agreements between PTS and third parties relating to Joint Technology, the Joint Project, or Joint Products. GMS expressly reserves its right to invoke and enforce that contractual audit procedure.

78. PTS's breaches caused GMS to suffer damages, including the loss of compensation due under the agreements, the value of the contractual benefits for which GMS bargained, and other recoverable damages, in an amount to be proven at trial.

79. GMS does not contend that PTS guaranteed successful commercialization or that PTS lacked the contractual right independently to own and commercialize standalone HLA proteins. GMS alleges instead that those independent rights did not relieve PTS of the separate affirmative obligation imposed by Section 4.3 to use its best efforts during the Term to jointly develop the Joint Products.

**<u>COUNT II</u>**

**QUANTUM MERUIT (Pleaded in the Alternative)**

**(Texas Common Law)**

80. GMS incorporates paragraphs 1-79.

81. GMS pleads this Count II claim in the alternative to its Count I breach-of-contract claim and only to the extent that no valid and enforceable contract governs the contributions or benefits at issue.

82. GMS provided valuable services and materials to PTS, including assisting in the preparation and development of grant proposals through which more than $3 million in funding was provided to PTS as a subcontractor, providing technical and collaborative assistance, and paying PTS $25,000 from GMS's own funds for the purchase of reagents used in protein production. PTS knowingly accepted and benefited from GMS's services and contributions under circumstances in which PTS had reasonable notice that GMS expected compensation for their value.

83. PTS accepted, used, and benefited from GMS's services and materials. Among other things, the grant funding obtained through GMS's efforts enabled PTS to develop and substantially

expand its Class I and Class II HLA protein portfolio, thereby enhancing the scope and commercial value of PTS's HLA protein offerings.

84. PTS retained and used the benefits of GMS's contributions in developing HLA proteins and related assets that PTS subsequently sold to a third party for approximately $300,000. Despite accepting and benefiting from GMS's contributions, PTS has not compensated GMS for their reasonable value.

85. Under these circumstances, it would be unjust for PTS to retain the benefit of GMS's contributions without compensating GMS for the reasonable value thereof.

86. Accordingly, to the extent any services, funding assistance, materials, or other benefits supplied by GMS are determined not to fall within the scope of an enforceable agreement between the parties, GMS is entitled to recover in quantum meruit the reasonable value of the services and materials provided to and accepted by PTS, in an amount to be determined at trial.

## CONDITIONS PRECEDENT

87. GMS incorporates paragraphs 1-86.

88. All conditions precedent to GMS's claims have occurred, have been performed, or have been excused. GMS provided written notice of the alleged breaches and made good-faith efforts to resolve the dispute. Those efforts failed to resolve the parties' dispute.

## ATTORNEYS' FEES

89. GMS seeks recovery of its reasonable and necessary attorneys' fees pursuant to Texas Civil Practice & Remedies Code §38.001 and other applicable laws. GMS further preserves its contractual right to recover attorneys' fees in any arbitration conducted pursuant to Section 9.5 of the Agreement.

## PRAYER FOR RELIEF

90. WHEREFORE, GMS respectfully requests that the Court enter judgment in its favor and award the following relief:

A. Award GMS actual damages against PTS in an amount to be determined at trial or arbitration for PTS's breach of contract and, alternatively and only if applicable, quantum meruit;

B. Order PTS to provide an accounting sufficient to determine the nature and amount of consideration received in connection with the subject asset transaction and whether and to what extent such consideration was attributable to Joint Technology, Joint Products, or patent rights identified in Exhibits A or B and therefore subject to the royalty provisions of Section 5.2;

C. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

D. Attorneys' fees and costs as permitted by law.

## JURY DEMAND

91. Under Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff GMS Biotech Inc respectfully requests a trial by jury of any and all issues properly triable to a jury under applicable law.

DATED: November 5, 2026

Respectfully submitted,

*/s/ Robb Edmonds*

Robb D. Edmonds (Attorney-in-Charge)
Texas Bar No. 24029530
Email: redmonds@edmondsiplaw.com
EDMONDS & CMAIDALKA, P.C.
16850 Diana Lane, Suite 102
Houston, Texas 77058
Telephone: 281-480-2700
Direct: 281-954-6239

***ATTORNEYS FOR PLAINTIFF,***
***GMS BIOTECH, INC.***